**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Sunil Nayyar, | : | |
| | : | Case No. 2:10-cv-00135-ALM-NMK |
| Plaintiff, | : | 2:12-cv-00189-ALM-NMK |
| | : | |
| v. | : | Judge Marbley |
| | : | |
| Mount Carmel Health System, et al., | : | Magistrate Judge King |
| | : | |
| Defendants. | : | |

## MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS MOUNT CARMEL HEALTH SYSTEM, DR. JOHN WEISS, DR. LI TANG, AND DR. RICHARD STRECK

Pursuant to Federal Rule of Civil Procedure 56, Defendants Mount Carmel Health System, Dr. John Weiss, Dr. Li Tang, and Dr. Richard Streck move for summary judgment on all of Plaintiff Sunil Nayyar's claims. The undisputed facts demonstrate that there are no genuine issues of material fact on essential elements of Plaintiff's claims such that Defendants are entitled to judgment as a matter of law. The reasons in support of this motion are set forth in detail in the attached memorandum in support.

Respectfully submitted,

/s/ M.J. Asensio
M. J. Asensio (0030777), Trial Attorney
Kristopher J. Armstrong (0077799), Of Counsel
BAKER & HOSTETLER, LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
masensio@bakerlaw.com
karmstrong@bakerlaw.com

Attorneys for Defendants Mount Carmel Health System, Dr. Weiss, Dr. Tang, and Dr. Streck

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2013, I electronically filed the foregoing document with the Clerk of Courts using the Court's CM/ECF system, which will send electronic notification of such filing to the following:

William W. Patmon, III, Esq.
M. Nikol Madison, Esq.
PATMON LLC
88 East Broad Street, Suite 2070
Columbus, Ohio 43215
wpatmon@patmonlaw.com

Attorneys for Plaintiff Sunil Nayyar

/s/ Kristopher J. Armstrong
 Attorney for Defendants

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Sunil Nayyar, | : | |
| | : | Case No. 2:10-cv-00135-ALM-NMK |
| Plaintiff, | : | 2:12-cv-00189-ALM-NMK |
| | : | |
| v. | : | Judge Marbley |
| | : | |
| Mount Carmel Health System, et al., | : | Magistrate Judge King |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.     INTRODUCTION …………………………………………………………1

II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND …………………2

    A.     Mount Carmel's Medical Residency Programs …………………………………..2
    B.     Plaintiff Joins Mount Carmel's Family Medicine Residency Program …………..3
    C.     Plaintiff Transfers To The Internal Medicine Residency Program ………………4
    D.     Mount Carmel West's Medical ICU ………………………………………...........5
    E.     Plaintiff Demonstrates Unprofessional Behavior ………………………………..6
    F.     The "A-Line" Incident And Investigation ………………………………………..6
    G.     Plaintiff's Termination And Appeal ……………………………………………..8

III.   LAW AND ARGUMENT ……………………………………………………...10

    A.     Summary Judgment Standard …………………………………………………...10

        - Fed. R. Civ. P. 56(c)
        - *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)
        - Fed. R. Civ. P. 56(e)(2)

    B.     Defendants Are Entitled To Summary Judgment On Plaintiff's Claims Alleging
        Race And National Origin Discrimination Under Federal And State Law ……...11

        - *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004)
        - *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)
        - *Mauzy v. Kelly Services, Inc.*, 75 Ohio St. 3d 578, 664 N.E.2d 1272, 1277-80
          (1996)

i

- *Evans v. Toys R Us, Inc.*, No. 99-3233, 2000 WL 761803, at *8 (6th Cir. June 2, 2000)
- *Talwar v. Catholic Health Partners*, 258 Fed. App'x 800, 805 (6th Cir. 2007)
- *Wharton v. Gorman-Rupp Co.*, 309 Fed. App'x 990, 995 (6th Cir. 2009)
- *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)
- *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)

1.   Plaintiff Cannot Establish A Prima Facie Case Because He Cannot Show That He Was Treated Less Favorably Than Another Person Outside His Protected Class, Or That He Was Replaced By Someone Outside His Protected Class …………………………………………………………..13

- *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)
- *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)
- *Talwar v. Catholic Healthcare Partners*, 258 Fed. App'x 800 (6th Cir. 2007)
- *Mawaldi v. St. Elizabeth Health Ctr.*, 381 F. Supp. 2d 675, 685-86 (N.D. Ohio 2005)

2.   Defendants Disciplined Plaintiff And Terminated His Employment For Legitimate Non-Discriminatory Reasons And Plaintiff Cannot Establish Pretext …………………………………………………………….......16

- *Snowden v. Proctor & Gamble Distributing Co.*, 14 Fed. App'x 605, 608 (6th Cir. 2001)
- *Yancey v. Canterbury On The Lake Nursing Home*, No. 07-13626, 2009 WL 1035331, at *9 (E.D. Mich. Apr. 16, 2009)
- *Evans v. Toys R Us, Inc.*, No. 99-3233, 2000 WL 761803, at *11 n.7 (6th Cir. June 2, 2000)
- *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008)
- *Gribcheck v. Runyon*, 245 F.3d 547, 552 (6th Cir. 2001)

C.   Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Retaliation In Violation Of Ohio's Whistleblower Statute ……………………...17

- Ohio Rev. Code §§ 4113.52(A)(1), (A)(3), (D)
- *Contreras v. Ferro Corp.*, 73 Ohio St. 3d. 244, 652 N.E.2d 940, 942-43 (1995)
- *Herrington v. DaimlerChrysler Corp.*, 262 F. Supp. 2d 861, 865 (N.D. Ohio 2003)
- *Wood v. Dorcas*, 142 Ohio App. 3d 783, 757 N.E.2d 17, 23-24 (Ohio Ct. App. 2001)

1.   Plaintiff Did Not Comply With The Procedural Requirements Of The Whistleblower Statute …………………………………………………19

- *Hill v. Mr. Money Finance Co. & First Citizens Banc Corp.*, 309 Fed. App'x 950, 955-60 (6th Cir. 2009)
- *Madison v. USF & G Fin. Servs. Corp.*, 118 Ohio App. 3d 431, 693 N.E.2d 293 (Ohio Ct. App. 1997)
- Ohio Rev. Code § 4113.52(C)
- *Gilreath v. Clemens & Co.*, 212 Fed. App'x 451, 464 (6th Cir. 2007)
- *Contreras v. Ferro Corp.*, 73 Ohio St. 3d. 244, 652 N.E.2d 940, 942-45 (1995)
- *Grove v. Fresh Mark, Inc.*, 156 Ohio App. 3d 620, 808 N.E.2d 416, 421-422 (Ohio Ct. App. 2004)
- *Davidson v. BP America, Inc.*, 125 Ohio App. 3d 643, 709 N.E.2d 510, 516-17 (Ohio Ct. App. 1997)
- *Haney v. Chrysler Corp.*, 121 Ohio App. 3d 137, 699 N.E.2d 121, 122-23 (Ohio Ct. App. 1997)

a.     Plaintiff Admits He Did Not Have A Reasonable Belief That A Criminal Violation Had Occurred ……………………………….21

- *Duvall v. United Rehabilitation Servs. of Greater Dayton*, No. 22500, 2008 WL 5064861, at *1, 4-6 (Ohio Ct. App. Nov. 26, 2008)
- *Lesko v. Riverside Methodist Hosp.*, No. 04AP-1130, 2005 WL 1482549, at * 6 (Ohio Ct. App. June 23, 2005)
- *Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *7 (Ohio Ct. App. Jan. 29, 2007)
- *Croskey v. Univ. Health Servs.*, No. 09 CA 37, 2009 WL 3756701, at * 2-3 (Ohio Ct. App. Nov. 6, 2009)

b.     Plaintiff's Notice Was Insufficient ……………………………...22

- *Naples v. Rossi*, No. 04 MA 172, 2005 WL 3536478, at *8-9 (Ohio Ct. App. Dec. 21, 2005)

2.     The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Advocating In Favor Of Patient Safety ……………………23

- *Price v. Matco Tools, Inc.*, No. 23583, 2007 WL 2810006, at *9 (Ohio Ct. App. Sept. 28, 2007)

D.     Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Wrongful Termination In Violation Of Public Policy …………………………..25

- *Painter v. Graley*, 70 Ohio St. 3d 377, 639 N.E.2d 51, 55-56 (1994)
- *Greeley v. Miami Valley Maint. Contr., Inc.*, 49 Ohio St. 3d 228, 551 N.E.2d 981, 987 (1990)
- *Collins v. Rizkana*, 73 Ohio St. 3d 65, 652 N.E.2d 653, 657-58 (1995)

- *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526, 529-30 (2002)

1.     Ohio Law Does Not Support A Claim Under The Public Policies Articulated By Plaintiff ………………………………………………26

- *Mitchell v. Mid-Ohio Emergency Services, L.L.C.*, No. 03AP-981, 2004 WL 2803419, at *1 (Ohio Ct. App. Sep. 30, 2004)
- *Cramer v. Fairfield Med. Ctr.*, 182 Ohio App. 3d 653, 914 N.E.2d 447, 455-57 (Ohio  Ct.  App.  2009)
- *Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *1 (Ohio Ct. App. Jan. 29, 2007)

2.     The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Advocating In Favor Of Patient Safety ……………………27

- *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526, 529-30 (2002)

E.     Defendants Are Entitled To Summary Judgment On Plaintiff 's Claim Alleging Retaliation In Violation Of The Federal False Claims Act ……………………...28

- 31 U.S.C. § 3730(h)
- *Scott v. Metropolitan Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007)

1.     Plaintiff Did Not Engage In Protected Activity …………………………29

- 31 U.S.C. § 3730(h)
- *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000)

2.     The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Complaining About Alleged Medicare Violations ………...30

- *Scott v. Metropolitan Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007)

F.     Defendants Are Entitled to Summary Judgment on Plaintiff's Claim Alleging Abuse of Process …………………………………………………………...30

- *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 626 N.E.2d 115, 117-18 (1994)

1.     Plaintiff Cannot Establish The First Element Because He Cannot Show That There Was A "Legal Proceeding" …………………………………31

iv

- *Gillman v. Schlagetter*, No. 3:08-CV-454, 2010 WL 3447807, at * 11 (S.D. Ohio Aug. 30, 2010)

2.    Plaintiff Cannot Establish The Second Element Because There Is No Evidence That The Investigatory And Disciplinary Process Was Perverted By An Ulterior Motive ……………………………………………..32

- *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 626 N.E.2d 115, 118 (1994)

G.    Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Intentional Infliction Of Emotional Distress ……………………………………32

- *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369, 453 N.E.2d 666, 671 (1983)
- *Scarabino v. E. Liverpool City Hosp.*, 155 Ohio App. 3d 576, 802 N.E.2d 188, 191 (Ohio Ct. App. 2003)
- *Rhoades v. Chase Bank*, No. 10AP-469, 2010 WL 5550703, at *3 (Ohio Ct. App. Dec. 30, 2010)
- *Church v. Executive Jet Services, Inc.*, No. 2:03-CV-20, 2005 WL 1925711, at *12 (S.D. Ohio Aug. 11, 2005)
- *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999)
- *Kohorst v. Van Wert Hosp.*, No. 3:09CV2031, 2010 WL 4883784, at *5 (N.D. Ohio Nov. 24, 2010)

H.    Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Spoliation Of Evidence …………………………………………………………34

- *Smith v. Howard Johnson Co., Inc.*, 67 Ohio St. 3d 28, 615 N.E.2d 1037, 1038 (1993)
- Fed. R. Civ. P. 56(c)
- *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004)

I.    Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Breach of Contract …………………………………………………………35

- *Marion Forum, L.L.C. v. Lynick Ents., Inc.*, No. 9-12-13, 2012 WL 6571388, at *2 (Ohio Ct. App. Dec. 17, 2012)

1.    Mount Carmel Did Not Breach Any Contractual Promise To Plaintiff …36

2.    Plaintiff Did Not Fulfill All Of His Contractual Obligations To Mount Carmel …………………………………………………………...38

- *Marion Forum, L.L.C. v. Lynick Ents., Inc.*, No. 9-12-13, 2012 WL 6571388, at *2 (Ohio Ct. App. Dec. 17, 2012)

J.      Defendants Are Entitled To Summary Judgment On Plaintiff's Claims Of Promissory Estoppel And Fraudulent Misrepresentation …………………………38

- *Sims v. Village of Midvale*, No. 2012 AP 03 0021, 2012 WL 6681851, at \*4 (Ohio Ct. App. Dec, 18, 2012)
- *Dana Partners, L.L.C. v. Koivisto Constructors & Erectors, Inc.*, No. 2011-T-0029, 2012 WL 6783637, at \*11 (Ohio Ct. App. Dec, 31, 2012)

      1.      There Was No Promise Or Misrepresentation That Was Not Complied With …………………………………………………………………...39

      - *Worthington v. Speedway SuperAmerica LLC*, No. 04CA2938, 2004 WL 2260501, at \*4 (Ohio Ct. App. Sept. 20, 2004)

      2.      Plaintiff Admits He Did Not Detrimentally Rely On Any Statements Or Representations …………………………………………………………41

      - *Heinz & Assoc., Inc. v. Diamond Cellar Holdings, L.L.C.*, No. 11AP-688, 2012 WL 1079087, at \*4 (Ohio Ct. App. Mar. 30, 2012)

K.      Defendants Are Entitled To Summary Judgment On Plaintiff's O.R.C. 4112 Claim ………………………………………………………………………41

- Ohio Rev. Code § 4112.02(A)

      1.      The Alleged Actions Are Not An Independent Violation Of Section 4112.02 ……………………………………………………………..42

      2.      There Is No Evidence That Dr. Borders' Termination Was Improper Or Related To Plaintiff ……………………………………………………...42

      3.      Plaintiff's Title VII Claim Is Not A Valid Claim …………………………43

IV.      **CONCLUSION** …………………………………………………………...43

## I.    <u>INTRODUCTION</u>

Plaintiff Sunil Nayyar ("Plaintiff") alleges that Defendants Mount Carmel Health System, Dr. John Weiss, Dr. Li Tang, and Dr. Richard Streck (collectively "Mount Carmel" or "Defendants") disciplined him and ultimately terminated his employment as a Resident in Mount Carmel's Internal Medicine Residency Program ("the Program") at Mount Carmel West Hospital on the basis of his race, national origin, alleged whistle-blowing activity in reporting patient safety concerns, and alleged protected activity in reporting alleged Medicare fraud.   Plaintiff also asserts several state common-law torts, a breach of contract claim, and a violation of Ohio Revised Code Section 4112.

Contrary to Plaintiff's allegations, the undisputed evidence demonstrates that Defendants terminated Plaintiff's employment because he exhibited a lack of professionalism in his conduct during an investigation into a medical procedure.  Specifically, Plaintiff impeded management's investigation of the incident by speaking with other employees after being told not to talk to anyone about the event, improperly tried to remove a fellow Resident from clinical duties, which was outside of his authority, and lied to management about his conduct in the investigation. These actions made it impossible for Mount Carmel to trust Plaintiff to treat its patients as a medical Resident and ultimately led to Plaintiff's termination.

As explained in further detail below, the evidence demonstrates that Plaintiff's race and national origin played no role in the termination of his employment, as there were no other similarly-situated Residents outside of Plaintiff's protected class who Defendants treated more favorably than Plaintiff.  In addition, the evidence also demonstrates that Plaintiff's alleged "whistle-blowing" activity was unrelated to his termination, as several others engaged in similar conduct but were not terminated.  Finally, the uncontroverted evidence shows that Plaintiff never

engaged in activity protected by the Medicare statutes, and that his state-law claims are without merit.

## II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.     Mount Carmel's Medical Residency Programs.

Mount Carmel operates medical residency programs in several specialties, including Internal Medicine, Family Medicine, OB/GYN, and others.  The mission of the residency programs is to develop the art and science of medicine by educating Resident physicians to become competent, compassionate, outcome-oriented healthcare providers.  (Pl. Dep. Ex. 6, p. 2).[1]  Most residency programs last three years.  Each year, Residents sign one-year employment agreements.  (Case No. 2:10-cv-00135, Doc. No. 64-1, Declaration of John C. Weiss, M.D., ("Weiss Dec.") ¶ 4).  Mount Carmel is not obligated to renew a Resident's contract from one year to the next.  (Weiss Dec. ¶ 4; *see also* Pl. Dep. 293-94).

Residents diagnose and treat patients under the supervision of attending physicians.  (Pl. Dep. 54-56).  Senior Residents, i.e., those in their third year, are supervised less closely by attending physicians and they also provide guidance to younger Residents.  (Pl. Dep. 56).  Each year, Residents progress through a series of month-long rotations in various fields of practice within the program's focus.  (Pl. Dep. 57).  Residents also participate in educational meetings and lectures.  (Pl. Dep. 51, 57).

Each residency program is overseen by a Program Director who must be a physician and must be board certified in the specialty for which the program provides training (e.g., Internal

---

[1] The first two volumes of Plaintiff's deposition, in which the pagination continues from one volume to the next, have been filed with the Court as Documents 61 and 62 in Case No. 2:10-cv-00135.  Pages from these volumes will be cited as Pl. Dep. __.  The third volume of Plaintiff's deposition (in which the pagination starts over at page 1) is being filed under the 2:10-cv-00189 case number and will be cited as 2013 Pl. Dep. __.

Medicine).  (Weiss Dec. ¶ 5).  The Program Directors, in turn, report to the Director of Graduate Medical Education, who may or may not be a physician.  (Weiss Dec. ¶ 6).  Mount Carmel's residency programs are accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), which accredits all allopathic graduate medical education programs in the United States.  (Weiss Dec. ¶ 7).

### B.       Plaintiff Joins Mount Carmel's Family Medicine Residency Program.

Plaintiff is a native of Central Ohio.  He received his B.S. in biology and chemistry from Youngstown State University, and his M.D. from Saba Medical School, in the Netherlands Antilles.  (Pl. Dep. 11).  Mount Carmel hired Plaintiff into its Family Medicine Residency Program in July of 2006.  (Pl. Dep. 16, 18, 26).

During the surgery rotation in his first year in the Family Medicine Program, Plaintiff looked at his work schedule for September of 2006 and believed that if he worked that schedule, he would exceed the ACGME's maximum hours rule.  (Pl. Dep. 28-29).  That rule states that Residents may not work more than 80 hours per week.  (Pl. Dep. 29).  The rule is violated only when a Resident's working hours for the entire month are averaged over the number of weeks in the month, and the result is in excess of 80 hours per week.  (Pl. Dep. 32, 46).[2]

Plaintiff told the Family Medicine's Program Director, and others, including the Senior Resident, that he thought he would exceed the maximum hours if he followed the schedule.  (Pl. Dep. 29, 32).  Everyone assured Plaintiff that he would not violate the maximum hours rule, but the senior Resident told Plaintiff to let him know if he was getting close to exceeding the maximum hours.  (Pl. Dep. 29-31).  Plaintiff specifically testified that neither the Program

---

[2] For example, if a Resident works more than 80 hours in a particular week, his or her hours can be reduced in subsequent weeks in the month to get the average weekly total under 80 without violating the rule.  (See Pl. Dep. 32, 46).

Director nor any other Family Medicine program official ever told him to violate the maximum hours rule.  (Pl. Dep. 32-33).

Despite this, Plaintiff proceeded to work more than the maximum hours allowed, and then proceeded to falsify his own time records to cover up his violation of the rule.  (Pl. Dep. 46).  The Family Medicine Program Director had a meeting with Plaintiff during which he counseled Plaintiff about falsifying his time records, and reminded Plaintiff that entering accurate information is important so that the leadership of the program can know if someone is exceeding their maximum hours.  (Pl. Dep. 47, 49).

> ### C.      **Plaintiff Transfers To The Internal Medicine Residency Program.**

At the end of his first year in the Family Medicine Program, Plaintiff asked to transfer to Mount Carmel's Internal Medicine Program because he did not like the Family Medicine Program and because Internal Medicine would better prepare him to achieve his ultimate goal of becoming a cardiologist.  (Pl. Dep. 24-24, 49-51).  Permitting Plaintiff's requested transfer would have a negative financial impact on Mount Carmel.  Specifically, the federal government would only pay for three years of Plaintiff's salary, meaning that if Plaintiff started over in a new three-year program, Mount Carmel would have to pay his salary for one of those years out of its own pocket.  (Weiss Dec. ¶ 8).

Despite this financial impact, and despite the episode in which Plaintiff reported what he thought was a violation of the ACGME maximum hours rule and then falsified his hours to cover up his violation of that rule, Mount Carmel permitted Plaintiff to transfer to the Internal Medicine Program.  (Pl. Dep. 293).  Plaintiff testified that one of the Internal Medicine faculty members, Dr. Vikram Tamaskar, was very supportive of his transferring to the new program. (Pl. Dep. 51). Plaintiff began as a first-year Internal Medicine Resident in July of 2007.

4

### D.     <u>Mount Carmel West's Medical ICU.</u>

One of the Internal Medicine Program's rotations is the Medical Intensive Care Unit, or "ICU" (sometimes called "MICU"). During Plaintiff's employment, the night shift in the Mount Carmel West ICU was staffed with Internal Medicine Residents as the front-line physicians. (Weiss Dec. ¶ 9-10). During that time period, if the Residents needed assistance or "back-up," several options existed. Residents could call the board-certified, critical-care attending physician, or a back-up Resident. (Pl. Dep. 307; Weiss Dec. ¶ 11). There was also a surgical team, a board-certified trauma surgeon, and a board-certified anesthesiologist in the hospital at all times in case the Resident needed assistance. (Pl. Dep. 307, 317-18; Weiss Dec. ¶ 11).

Staffing the ICU this way was within the applicable standard of care and consistent with the way many other hospitals staffed their ICUs at night. (Rutecki Dep. 219 (cited pages attached as Exhibit A to this memorandum)). That being said, improving patient safety is always a concern (as it is with any provider of health care), and it had been an ongoing focus in the ICU. (*See* Pl. Dep. 134-35). As Plaintiff testified, the Internal Medicine Program Director, Defendant Dr. John Weiss, and Dr. Tamaskar had raised the issue that safety in the ICU might be improved if there was an attending critical care specialist on-site at night. (Pl. Dep. 134-35). In January of 2009, sixteen Residents (including Plaintiff) signed a petition that Plaintiff prepared at the suggestion of Dr. Weiss. (Pl. Dep. 136, 138-39, 148). The petition said, "This is a petition from the entire residency program regarding the Medical Intensive Care Unit call. All residents who sign below agree that without an in-house Critical Care supervisor, safety is an active issue." (Pl. Dep. Ex. 3). Plaintiff gave the signed petition to Dr. Weiss. (Pl. Dep. 140). Plaintiff testified that his concerns in circulating the petition were the same as Dr. Weiss's concerns, and that Dr. Weiss was supportive of the petition. (Pl. Dep. 140, 144, 149).

### E. **Plaintiff Demonstrates Unprofessional Behavior.**

On May 22, 2009, Dr. Weiss was in his office with Dr. Tamaskar and another faculty member, Dr. Mark Easterday. (Weiss Dec. ¶ 12, Ex. A). Dr. Weiss observed Plaintiff enter his office and begin yelling at Dr. Tamaskar about a patient that Dr. Tamaskar had transferred to the ICU. *Id.* Plaintiff pointed his finger at Dr. Tamaskar's face, asked Dr. Tamaskar to take their dispute outside, and offered Dr. Tamaskar the first punch in a fight. *Id.* After Plaintiff calmed down, he told Dr. Weiss that Dr. Tamaskar had threatened to "kick his ass" when Plaintiff resisted admitting the patient to the ICU. *Id.* Dr. Weiss counseled both Plaintiff and Dr. Tamaskar in writing for their unprofessional behavior. *Id.*

### F. **The "A-Line" Incident And Investigation.**

On July 1, 2009, Mount Carmel signed a new contract with Plaintiff to complete his third year of the Internal Medicine Residency Program. (Pl. Dep. 322). Then, on July 9, Mount Carmel received a report about an incident in which Plaintiff was involved. A nurse named Lisa Cottrell reported that on the night of July 7, 2009, in the ICU, Plaintiff had been trying to insert an arterial line ("A-line") into a comatose patient. (Pl. Dep. Ex. 7). An A-line is somewhat, though not entirely, similar to an IV, but is inserted into an artery. (Weiss Dec. ¶ 14). Because arteries have higher pressure than veins, and for other reasons, inserting an A-line is more difficult than inserting an IV, and is typically only done by doctors, medical students, and nurses with special training. (Weiss Dec. ¶ 15).

Ms. Cottrell reported that after making three unsuccessful attempts to place the arterial line, Plaintiff asked the two nurses in the room, Ms. Cottrell and Amanda Bowers, whether they wanted to try. (*See* Pl. Dep. 279-89; Pl. Dep. Ex. 7). Ms. Cottrell spoke up and told Plaintiff that the procedure was outside of a nurse's scope of practice. *Id.* Ms. Cottrell reported that Ms. Bowers then said she would try to insert the A-line, "but this stays between us." *Id.* On Ms.

6

Bowers' first attempt, she caused a hematoma, but on her second attempt she succeeded in getting the needle into the artery, and Plaintiff then stepped in to suture the line in place.  *Id.*

After receiving Ms. Cottrell's report, Ms. Bowers' supervisors began an investigation and contacted Dr. Weiss to solicit information from Dr. Nayyar.  Dr. Weiss contacted Plaintiff by phone and told him that a nurse had made a complaint concerning the A-line incident, and that Plaintiff should not come in for his scheduled shift.  (Pl. Dep. 92).  Dr. Weiss told Dr. Nayyar that there would be an investigation and that he should not speak to anybody involved or speak to anyone else about what happened.  (Pl. Dep. 92-94; Weiss Dec. ¶ 16).

Plaintiff admits that (despite Dr. Weiss's admonition) he contacted two other Internal Medicine Residents—an OB-GYN Resident who was also on call the night of the A-line incident, and Ms. Bowers—to discuss the report of improprieties in the A-line incident.  (Pl. Dep. 95, 99).  The OB-GYN Resident who was on duty in the ICU the night of the A-line incident also reported to Mount Carmel that Plaintiff called her the next day and told her that he was placing her on administrative leave and that she should not come to work.  (Weiss Dec. ¶ 17).  Plaintiff lacked the authority to place anyone on leave.  (Weiss Dec. ¶ 18).

Dr. Weiss asked Plaintiff to provide a written statement about the A-line incident.  (Pl. Dep. 96, 104, 281 & Ex. 1; Weiss Dec. ¶ 16).   That statement conflicted with Ms. Cottrell's report of the incident.  (*See* Pl. Dep. Ex. 1).  Plaintiff stated that he had been attempting to insert an arterial line into a patient for about 20 minutes without success, when his back started to cramp.  *Id.*  Plaintiff then stated that he asked Ms. Bowers to hold the needle in place under the patient's skin while he worked out his cramp.  *Id.*  He stated that while holding the line, Ms. Bowers must have moved it and gotten the needle into the artery—accomplishing by accident what Plaintiff had been attempting to do for twenty minutes.  *Id.*; (Pl. Dep. 106).

7

The next week, Plaintiff attended a meeting with Dr. Weiss and representatives from Mount Carmel Human Resources.  (Pl. Dep. 116, 118).  At the meeting, Plaintiff was asked whether he had spoken to Amanda Bowers since the incident.  (Pl. Dep. 116).  Plaintiff admitted at his deposition that he lied to Dr. Weiss and Human Resources in response to that question, telling them that he had not spoken to Ms. Bowers, when, in fact, he had.  (Pl. Dep. 116-17).  He also admitted that he spoke to other Residents about the A-line incident.  (Pl. Dep. 116, 118).

### G.   Plaintiff's Termination And Appeal.

Under ACGME guidelines, Residents are judged based on six core competencies.  (Pl. Dep. 128; Weiss Dec. ¶ 19).  One of those competencies is professionalism.  (Pl. Dep. 128; Weiss Dec. ¶ 19).  Professionalism includes "accountability to patients, society, and the profession."  (Pl. Dep. Ex. 6, p. 6).  Plaintiff understood that professionalism also includes reporting information accurately and truthfully.  (Pl. Dep. 129, 265).  He knew that it includes following appropriate instructions of the program director.  (Pl. Dep. 129).

Based on Plaintiff's disobedience of Dr. Weiss's instruction not to discuss the A-line incident with anyone else (which impeded the investigation), on his attempt to put another Resident on leave (which was outside of his authority), and his untruthfulness in the investigation, Dr. Weiss, in conjunction with Human Resources, made the decision to terminate Plaintiff's employment.  (Pl. Dep. 120, 124 & Ex. 2).  Dr. Weiss concluded that after the events that had unfolded, he simply lacked the trust necessary to allow Plaintiff to treat Mount Carmel's patients.  (Weiss Dec. ¶ 20).

The ACGME requires all programs to have a "due process" policy in place that will apply when a Resident is disciplined or terminated from a program.  (Weiss Dec. ¶ 21).  The ACGME does not specify what the content of the policy must be; it only requires that programs have a policy and follow it.  (Weiss Dec. ¶ 22).  Mount Carmel's due process policy provides

that a Resident who is terminated may seek review of the termination by a special Program Education Committee ("PEC").  (Pl. Dep. 129-30, 237 & Ex. 6, p. 10).

The policy states that the PEC, which consists of the Assistant Program Director and at least two faculty members, shall meet with the Resident and the Program Director, who may present their respective arguments and evidence regarding the termination decision.   (Pl. Dep. Ex. 6, p. 10).   The PEC then deliberates and presents its recommendation to the Program Director, who is obliged to consider the recommendation, but need not follow it, in deciding whether to uphold the termination.  *Id*.  The Resident then has the option of asking the Director of Medical Education and an Administrative Review Committee ("ARC") to review whether the PEC followed the grievance procedure and honored due process.  *Id*.

Plaintiff sought review of his termination by the PEC.  (Pl. Dep. 129-30).  Dr. Weiss and Dr. Nayyar both spoke to the PEC.  (Plaintiff Dep. 131, 233-34).  Plaintiff testified that he had the opportunity to speak and address everything in his termination letter.  (Pl. Dep. 131, 233-34).  After considering the presentations, the PEC voted to recommend that the decision to terminate Plaintiff's employment stand.  (Pl. Dep. Ex. 10).  Plaintiff sought review by the ARC, which determined that the PEC had followed the grievance procedure and that due process had been honored.  (Pl. Dep. 235-36 & Ex. 5).  Plaintiff's termination was finalized on August 26, 2009. *Id*.

Ms. Bowers, a Caucasian woman, was terminated due to her role in the A-line incident. (Pl. Dep. 232-33).  She appealed her termination, and during her appeal process gave a statement in which she said that Plaintiff asked her to lie during the investigation by claiming that she never touched the A-line at all.  (Case No. 2:10-cv-00135, Doc. No. 64-2, Declaration of Steven E. Kile ¶ 4-5 & Ex. A).

III.    **LAW AND ARGUMENT**

This case is the consolidation of two lawsuits, the first brought in 2010 ("the 2010 Case") and the second in 2012 (the "2012 Case").  Plaintiff's Second Amended Complaint in the 2010 Case alleges claims for: (1) race and national origin discrimination in violation of federal and state law; (2) retaliation in violation of Ohio's Whistleblower Protection Act; (3) wrongful termination in violation of public policy; (4) retaliation in violation of the federal False Claims Act; (5) abuse of process; (6) intentional infliction of emotional distress; (7) and spoliation of evidence.  Plaintiff's Amended Complaint in the 2012 case alleges claims for (8) breach of contract; (9) promissory estoppel; (10) fraudulent misrepresentation; and (11) alleged violation of Ohio Revised Code Chapter 4112.  Defendants are entitled to summary judgment on all of these claims.

A.    **Summary Judgment Standard.**

Rule 56 of the Federal Rules of Civil Procedure allows a court to expeditiously dispose of a claim when it is factually unsupported and there is, consequently, no need for a trial. Specifically, a court should enter summary judgment on a claim "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is viewed "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure a just, speedy, and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party seeking summary judgment bears the initial responsibility of pointing to some evidence, or lack of evidence, of the type listed in Rule 56(c) "which demonstrates the absence of a genuine issue of material fact" on one or more essential elements of the non-movant's claim or claims. *See id*. at 323. This responsibility does not require the movant to point to facts

negating the non-movant's claims. *See id.* Once the movant has met its initial responsibility, the non-moving party then has the burden of pointing to specific evidence of the type listed in Rule 56(c), which establishes that, contrary to the movant's argument, there is a genuine issue of material fact that should be resolved through trial. *See* Fed. R. Civ. P. 56(e)(2); *see also Celotex Corp.*, 477 U.S. at 324. Ultimately, the Rule provides that if the non-moving party is unable to meet its burden "summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

> **B.**     **Defendants Are Entitled To Summary Judgment On Plaintiff's Claims Alleging Race And National Origin Discrimination Under Federal And State Law.**

In the fourth and sixth claims for relief in the 2010 Case, Plaintiff alleges that Defendants discriminated against him on the basis of his race and national origin in violation of Title VII, 42 U.S.C. §1981, and Ohio Revised Code Chapter 4112. (*See* 2010 Case Second Amd. Complaint, at ¶¶ 115-17, 125-27). In particular, Plaintiff alleges that Defendants treated him less favorably than other Caucasian Residents when they disciplined him and ultimately terminated his employment. (*See id.*, at ¶¶ 49-57). Defendants are entitled to summary judgment on these claims for two reasons. First, Plaintiff cannot establish a *prima facie* case because he cannot identify any similarly-situated Resident outside of his protected class who was treated more favorably than Plaintiff. Second, even if he could, Defendants terminated Plaintiff's employment for legitimate non-discriminatory reasons (namely, impeding the investigation into the arterial line incident, improperly removing another Resident from clinical duties, and lying to Defendants during the investigation) and Plaintiff cannot establish that these legitimate non-discriminatory reasons are a pretext for discrimination.

The focus of a disparate treatment claim under Title VII, Section 1981, or Ohio Revised Code Chapter 4112[3] is whether the decision-makers in the challenged adverse employment action intentionally discriminated against the plaintiff.  *See, e.g.*, *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.") (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)); *see also Mauzy v. Kelly Services, Inc.*, 75 Ohio St. 3d 578, 664 N.E.2d 1272, 1277-80 (1996) (stating the same).  In single-motive cases, such as the instant case, a plaintiff must establish the discriminatory intent of the decision-makers through either direct or indirect evidence.  *See Mauzy*, 664 N.E.2d at 1277-80; *Evans v. Toys R Us, Inc.*, No. 99-3233, 2000 WL 761803, at *8 (6th Cir. June 2, 2000).

Direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *See Talwar v. Catholic Health Partners*, 258 Fed. App'x 800, 805 (6th Cir. 2007); *see also Wharton v. Gorman-Rupp Co.*, 309 Fed. App'x 990, 995 (6th Cir. 2009) (describing examples of "direct evidence").  Where a plaintiff provides direct evidence, "the case should proceed as an ordinary civil matter" and "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."  *See Wharton*, 309 Fed. App'x at 995.  In contrast, indirect evidence does not on its face establish discriminatory intent, but rather is proof that allows a fact-finder to draw a reasonable inference that discrimination occurred.  *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir.

---

[3] Claims of alleged discrimination under Title VII, 42 U.S.C. § 1981, and Ohio Revised Code Chapter 4112 are all analyzed substantially the same.  *See Evans v. Toys R Us, Inc.*, 2000 WL 761803, at *8 (6th Cir. June 2, 2000).

2003). When a plaintiff relies upon indirect evidence, his or her claims are subject to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as clarified by later Supreme Court decisions. *See Wharton*, 317 F.3d at 570.

Under the *McDonnell Douglas* framework, a plaintiff has the initial burden of establishing a *prima facie* case. *See McDonnell Douglas*, 411 U.S. at 802. Assuming the plaintiff provides evidence sufficient to satisfy each element of the *prima facie* case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the adverse employment actions against the plaintiff. *See id*. at 802-803. Finally, if the defendant successfully articulates a legitimate non-discriminatory reason, the burden shifts back to the plaintiff to show that the defendant's proffered non-discriminatory reason was a pretext for discrimination. *See id*. at 803-05.

      **1.**    **Plaintiff Cannot Establish A Prima Facie Case Because He Cannot Show That He Was Treated Less Favorably Than Another Person Outside His Protected Class, Or That He Was Replaced By Someone Outside His Protected Class.**

In this case, Plaintiff does not allege or provide any direct evidence of discrimination. Instead, Plaintiff claims an inference of discrimination based upon the allegation that Defendants treated a similarly-situated Caucasian medical Resident more favorably than Plaintiff. (*See* 2010 Case Second Amd. Complaint, at ¶¶ 49-57; Pl. Dep. 226-27). Accordingly, Plaintiff is subject to the *McDonnell Douglas* framework and has the initial burden of establishing a *prima facie* case.

To do so, Plaintiff must establish:

(1) that he is a member of a protected class;
(2) that he was qualified for his position;
(3) that he was subjected to an adverse employment action; and
(4) that he was either replaced by a person outside his protected class or was treated less favorably than a similarly situated person outside his protected class.

*See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). "[T]o be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff cannot establish the fourth element of the *prima facie* case. While Plaintiff alleges that Defendants treated Caucasian medical Residents more favorably, Plaintiff pointed to only one individual who was a Resident and was also supervised by Dr. Weiss: a Caucasian Resident named Jonathan Borders. However, Plaintiff's own testimony demonstrates that Dr. Borders did not engage in many of the same acts of misconduct as Plaintiff, and was not treated more favorably than Plaintiff.

Specifically, unlike Plaintiff, who was terminated for interfering with an investigation and lying during that investigation, Plaintiff testified that Dr. Borders had problems with tardiness and absenteeism. (Pl. Dep. 230). Plaintiff admitted that he has no evidence that Dr. Borders ever impeded an investigation. (Pl. Dep. 231). Further there is no evidence that Dr. Borders ever attempted to improperly remove another Resident from clinical duties. Because Dr. Borders did not engage in these same acts of misconduct as Plaintiff, he is not "similarly situated." In addition, when his conduct advanced from tardiness and absenteeism to lying about incidents that occurred while on-duty and responsible for patient care, Dr. Borders was promptly terminated from the Internal Medicine Residency Program, just like Plaintiff. (*See* Pl. Dep. 232). Accordingly, even if they were similarly situated (which they are not), Dr. Borders was not treated more favorably than Plaintiff.

Summary judgment in favor of Defendants is warranted under these circumstances. For example, in *Talwar v. Catholic Healthcare Partners*, 258 Fed. App'x 800 (6th Cir. 2007), the Sixth Circuit affirmed summary judgment against an Indian-born surgeon who sued for race discrimination after his hospital privileges were terminated due to quality-of-care concerns with his clinical performance. *See id*. at 802-03. The Sixth Circuit found that, with respect to the *prima facie* case, the Plaintiff could not establish the fourth element because he failed to point to a similarly-situated doctor outside his protected class who received more favorable treatment. *See id*. at 806; *see also Mawaldi v. St. Elizabeth Health Ctr.*, 381 F. Supp. 2d 675, 685-86 (N.D. Ohio 2005) (finding, among other evidentiary failures, that medical resident could not make out a *prima facie* case of national origin discrimination because he "failed to point to a single non-protected, similarly situated person who was treated differently than he was" and granting summary judgment). Finally, Plaintiff has no evidence that he was replaced by a Resident outside of his protected class. In fact, Plaintiff's position in the third-year Resident class was not filled. (Weiss Dec. ¶ 23).

In sum, Plaintiff's claim that Dr. Weiss terminated him on the basis of his race or national origin fails as a matter of law. This is not surprising considering that the Internal Medicine Residency Program—whose members are selected by the same person who terminated Plaintiff, Dr. Weiss, is extremely diverse in nationality and racial background, as one look at the full-color poster showing the Residents during Plaintiff's second year demonstrates. (Pl. Dep. 217-224 & Ex. 4). Against this backdrop, Plaintiff's claim of discrimination is absurd. Accordingly, Defendants are entitled to summary judgment on Plaintiff's discrimination claims because he cannot establish the fourth element of his *prima facie* case.

> **2. Defendants Disciplined Plaintiff And Terminated His Employment For Legitimate Non-Discriminatory Reasons And Plaintiff Cannot Establish Pretext.**

Even assuming that Plaintiff could establish a *prima facie* case, his discrimination claims would still fail as a matter of law because Defendants have articulated legitimate non-discriminatory reasons for their actions; namely, the fact that Plaintiff impeded the investigation into the arterial line incident, improperly tried to remove another Resident from clinical duties, and lied during the investigation.

These reasons are more than enough justification for disciplining and then terminating Plaintiff's residency.  *See, e.g.*, *Snowden v. Proctor & Gamble Distributing Co.*, 14 Fed. App'x 605, 608 (6th Cir. 2001) (finding that an employee impeding a disciplinary investigation by lying to his employer is a legitimate non-discriminatory reason for termination of employment and affirming summary judgment); *Yancey v. Canterbury On The Lake Nursing Home*, No. 07-13626, 2009 WL 1035331, at *9 (E.D. Mich. Apr. 16, 2009) (finding that an employee impeding a disciplinary investigation by lying in a written statement was a legitimate non-discriminatory reason for termination and granting summary judgment).  Moreover, it is worth noting that "an employer may make employment decisions for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *See Evans v. Toys R Us, Inc.*, No. 99-3233, 2000 WL 761803, at *11 n.7 (6th Cir. June 2, 2000).

Finally, Plaintiff cannot show that the reasons for his termination are a pretext for discrimination.  To do so, Plaintiff "must show 'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate discharge, or (3) that they were *insufficient* to motivate discharge.'" *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (emphasis in original); *see also Gribcheck v. Runyon*, 245 F.3d 547, 552 (6th Cir. 2001) ("[T]he plaintiff must answer the defendant's nondiscriminatory reasons by demonstrating that a

reasonable jury could find by a preponderance of the evidence that the defendant's stated reasons are pretextual.").

In this case, Defendants also terminated Ms. Bowers, a Caucasian nurse, for her conduct, including lying during the investigation of the arterial line incident.  (Pl. Dep. 232-33).  This fact alone demonstrates that Defendants' stated reasons motivated the discharge, and were sufficient for discharge, as it would be incredible to infer that Defendants would terminate the employment of a nurse outside the protected class as a pretext to terminate Plaintiff's employment because of his race.

Furthermore, Plaintiff admitted that he spoke to others regarding the investigation and that he lied to management during the investigation.  (Pl. Dep. 116-18).  This admission by Plaintiff demonstrates that Defendants' legitimate non-discriminatory reasons are grounded in fact.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's discrimination claims because they have articulated legitimate non-discriminatory reasons for Plaintiff's termination and Plaintiff has no evidence of any pretext that would create a genuine issue of material fact to be resolved at trial.

### C.    Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Retaliation In Violation Of Ohio's Whistleblower Statute.

In the second claim for relief in his 2010 Case, Plaintiff alleges that Mount Carmel wrongfully retaliated against him in violation of Ohio Revised Code § 4113.52, also known as the Ohio Whistleblower Protection Act ("OWPA").  (*See* 2010 Case Second Amd. Complaint, at ¶¶ 106-110).  In particular, Plaintiff claims his employment was terminated because he complained about an alleged safety issue involving staffing in the Mount Carmel West ICU. (*See id.*, at ¶¶ 107-109).  However, Defendants are entitled to summary judgment on this claim for two reasons.  First, Plaintiff has not complied with the procedural requirements of the

17

OWPA, and thus his claim is barred as a matter of law.  Second, the undisputed evidence demonstrates that Mount Carmel did not terminate Plaintiff's employment in retaliation for any alleged protected activity.

Ohio Revised Code § 4113.52 provides employees a cause of action if their employer subjects them to an adverse employment action for having reported the following:

> "(A)(1)(a) . . . a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution. . . .
>
> . . .
>
> [(A)(2)] . . . a violation of chapter 3704., 3734., 6109., or 6111. of the Revised Code that is a criminal offense . . . .
>
> [(A)(3)] . . . a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution . . . ."

See Ohio Rev. Code §§ 4113.52(A)(1), (A)(3), (D); see also Contreras v. Ferro Corp., 73 Ohio St. 3d. 244, 652 N.E.2d 940, 942-43 (1995).

To establish a *prima facie* case under the statute, a plaintiff must prove that: (1) he engaged in activity protected by the statute; (2) he was subject to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action.  *See Herrington v. DaimlerChrysler Corp.*, 262 F. Supp. 2d 861, 865 (N.D. Ohio 2003). If the plaintiff establishes a *prima facie* case, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action.  *See id*.  If the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for

18

retaliation.  *See id.*; *see also Wood v. Dorcas*, 142 Ohio App. 3d 783, 757 N.E.2d 17, 23-24 (Ohio Ct. App. 2001) (applying burden-shifting framework to a claim under Ohio Revised Code § 4113.52).

### 1. Plaintiff Did Not Comply With The Procedural Requirements Of The Whistleblower Statute.

To satisfy the "protected activity" element, an employee must satisfy a number of strict procedural requirements before he or she is afforded status as a "whistleblower."  First, and prior to reporting any violation, an employee must have undertaken efforts to confirm the accuracy of his or her belief that a violation covered by the statute occurred.  *See Hill v. Mr. Money Finance Co. & First Citizens Banc Corp.*, 309 Fed. App'x 950, 955-60 (6th Cir. 2009); *see also Madison v. USF & G Fin. Servs. Corp.*, 118 Ohio App. 3d 431, 693 N.E.2d 293 (Ohio Ct. App. 1997).

This involves undertaking sufficient investigatory efforts so that the employee can "reasonably" believe the following: (1) that a violation listed in the statute has taken place; (2) that the violation is a criminal offense; and (3) that the violation is either a hazard to public health or safety, a felony, or an improper solicitation for a contribution.  *See id*.  To the extent that an employee did not undertake sufficient efforts to form such a "reasonable belief," his or her claim under the OWPA is barred and summary judgment should be granted to the employer. *See Hill*, 309 Fed. App'x at 955-60 (affirming a district court's grant of summary judgment to a defendant on this basis); Ohio Rev. Code § 4113.52(C) (stating that if an employee fails to undertake this effort and acquire a "reasonable belief" then "the employee may be subject to disciplinary action by the employee's employer, including suspension or removal, for reporting information without a reasonable basis to do so.").

Second, a plaintiff must also have strictly complied with the reporting procedure outlined in the statute.  *See, e.g.*, *Gilreath v. Clemens & Co.*, 212 Fed. App'x 451, 464 (6th Cir. 2007)

19

(citing *Contreras*, 652 N.E.2d at 943-44).  Under the statute, (1) the employee must orally notify the employee's supervisor or other responsible officer of the company; (2) the employee must subsequently file a written report with the supervisor to whom he or she orally reported the violation; (3) the written report must contain "sufficient detail to identify and describe the violation"; and (4) with respect to reporting a violation under Section 4113.52(A)(1)(a), if, within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employer has not made a reasonable or good faith effort to correct the violation, then the employee may file a written report with the appropriate governmental official.  *See Contreras*, 652 N.E.2d at 942-45; *see, e.g.*, *Grove v. Fresh Mark, Inc.*, 156 Ohio App. 3d 620, 808 N.E.2d 416, 421-422 (Ohio Ct. App. 2004) (as to "sufficient detail" requirement).  To the extent that a plaintiff does not comply with these procedures, summary judgment must be granted in favor of the employer.  *See id.*

Any written report submitted under step two of the reporting procedure outlined above must be sufficiently detailed so as to clearly identify the alleged criminal violation.  *See, e.g.*, *Grove*, 808 N.E.2d at 423 (affirming the trial court's grant of summary judgment by finding that an e-mail that "loosely describes the unlawful actions of appellee" was insufficient without "details of the various allegations [the plaintiff] set forth in her complaint."); *Davidson v. BP America, Inc.*, 125 Ohio App. 3d 643, 709 N.E.2d 510, 516-17 (Ohio Ct. App. 1997) (affirming the trial court's grant of summary judgment based upon ruling that the plaintiff's internal reports to his employer were "not sufficiently detailed to show violation [sic] of local, state or federal law"); *Haney v. Chrysler Corp.*, 121 Ohio App. 3d 137, 699 N.E.2d 121, 122-23 (Ohio Ct. App. 1997) (affirming summary judgment against the plaintiff because the plaintiff's four letters complaining about safety records and suggestions for improvements "lack[ed] sufficient detail to

identify and describe a specific safety violation").  If a plaintiff fails to provide this required detail, summary judgment must be granted in favor of the employer.  *See id*.

Here, Plaintiff has not complied with the procedural requirements of the Whistleblower Statute in two fundamental ways.  First, Plaintiff cannot show that he possessed the required "reasonable belief" that a criminal violation specified under Sections 4113.52(A)(1)(a) or (A)(3) occurred.  Second, Plaintiff cannot show that he orally notified his supervisor and followed-up with a written report providing sufficient detail to identify the alleged criminal violations.

a. <u>Plaintiff Admits He Did Not Have A Reasonable Belief That A<br>Criminal Violation Had Occurred.</u>

With respect to the "reasonable belief" requirement, Plaintiff thought that the alleged staffing issue at the Mount Carmel West ICU was a safety issue for patients.  However, Plaintiff never undertook any due diligence to determine whether the safety issue rose to the level of a criminal violation.  (*See* Pl. Dep. 308, 310-11).  In fact, Plaintiff testified that he was not aware of any laws requiring the hospital to have on-site critical care physicians at night.  (Pl. Dep. 308). He testified that when he wrote the petition about staffing in the ICU, he was not aware of any laws that were being broken, and that his only concern was patient safety:

 Q. Your concerns about what the problems were in the ICU with the staffing at night had to do with patient safety, correct?

 A. Yes.

. . . .

 Q. Were you aware of any laws that were being broken or any requirements that were not being met?

 A. I don't know what all the laws are so I can't comment on that.

 Q. Okay.  So for you it was a patient safety issue only?

 A. Yes.

21

(Pl. Dep. 310-11).

Under similar circumstances, courts have granted or affirmed summary judgment by holding that a plaintiff has not satisfied the "reasonable belief" requirement and has not obtained protected status as a whistleblower. *See, e.g.*, *Duvall v. United Rehabilitation Servs. of Greater Dayton*, No. 22500, 2008 WL 5064861, at *1, 4-6 (Ohio Ct. App. Nov. 26, 2008) (affirming summary judgment against a licensed physical therapist plaintiff who complained about patient treatment and safety by finding that the plaintiff did not have a reasonable belief that such complaints concerned a criminal violation); *Lesko v. Riverside Methodist Hosp.*, No. 04AP-1130, 2005 WL 1482549, at * 6 (Ohio Ct. App. June 23, 2005) (finding the same as *Duvall* with respect to a registered nurse reporting alleged health and safety violations); *Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *7 (Ohio Ct. App. Jan. 29, 2007) (affirming summary judgment against a hospital executive and her secretary alleging whistleblower protection by finding that they did not have a "reasonable belief" that certain patient safety concerns were criminal violations because they "could not say that it was illegal [conduct]" when questioned during their depositions); *see also Croskey v. Univ. Health Servs.*, No. 09 CA 37, 2009 WL 3756701, at * 2-3 (Ohio Ct. App. Nov. 6, 2009) (finding that "complaints [that the plaintiff, a nurse,] may have made with regard to patient care, were vague, and we do not find support in the record that [plaintiff] believed that such complaints were criminal offenses which would result in an imminent risk of physical harm or create a public hazard").

b.      Plaintiff's Notice Was Insufficient.

With respect to the notification requirements, Plaintiff admitted that he never orally informed any of his supervisors that a criminal violation was taking place as a result of the way Mount Carmel was staffing the ICU.  (*See* Pl. Dep. 308, 310-11).  Plaintiff's oral complaints to his supervisor focused solely on safety and had nothing to do with criminality.  *Id.*

Moreover, the Residents signed petition is Plaintiff's only written communication provided to his supervisors regarding any alleged patient safety issues in the ICU.  (Pl. Dep. 301).  Nowhere does that petition claim that the hospital is committing a criminal offense because of its alleged manner of staffing the ICU, as is required by the OWPA.  (Pl. Dep. Ex. 3). Instead, the sole focus of the petition is safety.  *Id.*

Courts have found under similar circumstances that a plaintiff has not satisfied the written report requirements of the Whistleblower Statute, and thus have granted or affirmed summary judgment against the former employee.  *See, e.g.*, *Naples v. Rossi*, No. 04 MA 172, 2005 WL 3536478, at *8-9 (Ohio Ct. App. Dec. 21, 2005) (finding that in order to satisfy the written report requirement, the content of the report must identify the specific criminal statutes and, to the extent it does not imply a felony, specifically explain how the criminal violation creates a "risk of physical harm to persons" or "is likely to cause a hazard to public health or safety").

Accordingly, Defendants are entitled to summary judgment on Plaintiff's Whistleblower Claims because he cannot establish that he complied with the strict procedural requirements of the statute.

**2.      The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Advocating In Favor Of Patient Safety.**

Even if Plaintiff had complied with the procedural requirements of the Whistleblower Statute and thereby gained protected status, there is no evidence that Mount Carmel retaliated against Plaintiff for advocating in favor of patient safety through the Residents' petition.  In fact, the evidence conclusively demonstrates the opposite.

First, Dr. Weiss, the decision-maker with respect to Plaintiff's termination and the member of management to whom the Residents' petition was given, asked Plaintiff to become

involved on the issue of patient safety and work with him to address that issue. (Pl. Dep. 302). In fact, Plaintiff admits that Dr. Weiss raised the same concerns as Plaintiff, and encouraged his activity with the petition. (Pl. Dep. 302-03, 306-07). The fact that Dr. Weiss—who made the decision to terminate Plaintiff—actually encouraged Plaintiff's alleged protected activity undercuts any claim of retaliatory termination. In addition, fourteen other medical Residents who signed the petition were not terminated. (*See* Pl. Dep. 322). Finally, Plaintiff himself *admits* that Dr. Weiss did not retaliate against him for his role in creating the petition. (Pl. Dep. 149).

If Plaintiff's own testimony that the decision-maker did not retaliate against him for the alleged protected activity was not sufficient to scuttle his claim as matter of law, the timeline of events further demonstrates a total lack of causation. The Residents' petition regarding patient safety was submitted to Mount Carmel in January of 2009. While it was not obligated to do so, Mount Carmel signed a new contract with Plaintiff for his third year of residency six months later on July 1, 2009. Then, in the next several weeks, Defendants discovered Plaintiff's attempts to impede the investigation into the July 7, 2009, arterial line incident, attempt to remove a fellow Resident from clinical duties, and his untruthfulness, and Plaintiff's employment was terminated shortly thereafter.

The passage of six months and the contract renewal, coupled with the intervening professionalism issues that led swiftly and directly to Plaintiff's termination, demonstrate the lack of any connection between the termination and Plaintiff's alleged protected activity from the previous January. *See Price v. Matco Tools, Inc.*, No. 23583, 2007 WL 2810006, at *9 (Ohio Ct. App. Sept. 28, 2007) ("Standing alone, however, temporal proximity does not establish the

requisite connection, and this is particularly true when the evidence demonstrates intervening performance concerns.")

Taken together, the evidence conclusively demonstrates that there is no genuine issue of material fact as to whether the Residents' petition was the motivating factor in Plaintiff's termination of employment.  Accordingly, Defendants are entitled to summary judgment on this claim as Plaintiff cannot show that Defendants retaliated against him because of any alleged protected activity under the Whistleblower Statute.

**D.      Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Wrongful Termination In Violation Of Public Policy.**

In the first claim for relief set forth in the 2010 case, Plaintiff alleges that Defendants disciplined him and eventually terminated his employment in retaliation for attempting to vindicate public policies relating to patient safety.  (*See* 2010 Case Second Amd. Complaint, at ¶¶ 101-05).  Summary judgment on this claim in favor of Defendants is appropriate for two reasons.   First, Ohio law does not support a claim under the public policy articulated by Plaintiff.   Second, the undisputed facts show that Defendants did not retaliate against Plaintiff for advocating in favor of patient safety.

Ohio law recognizes a tort of wrongful termination in violation of public policy as an exception to the at-will employment doctrine.  *See Painter v. Graley*, 70 Ohio St. 3d 377, 639 N.E.2d 51, 55-56 (1994); *Greeley v. Miami Valley Maint. Contr., Inc.*, 49 Ohio St. 3d 228, 551 N.E.2d 981, 987 (1990).  To establish such a claim, the plaintiff must prove: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute, or administrative regulation or in the common law ("clarity" element), (2) that dismissing employees under circumstances like those involved in the plaintiff's case would jeopardize the public policy ("jeopardy" element), (3) that the adverse employment action was motivated by

conduct related to the public policy ("causation" element), and (4) that the employer lacked an overriding legitimate business justification for the adverse employment action ("overriding justification" element). *See Collins v. Rizkana*, 73 Ohio St. 3d 65, 652 N.E.2d 653, 657-58 (1995); *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526, 529-30 (2002). The failure to satisfy any one element requires that summary judgment be entered in favor of the employer. *See id.*

### 1. Ohio Law Does Not Support A Claim Under The Public Policies Articulated By Plaintiff.

Regarding the first element, Ohio courts have held under circumstances similar to those in this case that patient safety is not a viable public policy on which to base a wrongful termination claim. For example, in *Mitchell v. Mid-Ohio Emergency Services, L.L.C.*, No. 03AP-981, 2004 WL 2803419, at *1 (Ohio Ct. App. Sep. 30, 2004), the Tenth District Court of Appeals in Franklin County considered a case very similar to the instant case. In *Mitchell*, the plaintiff was an emergency room physician working at the Grant and Riverside Hospitals in Columbus. *See id.* at *1. In 1998, the Grant and Riverside Hospitals introduced a new patient admittance policy to solve the problem of overcrowding. *See id.* The plaintiff opposed this policy because he believed it would lead to substandard care of patients. *See id.* Toward that end, the plaintiff sent multiple letters to supervising doctors complaining about the policy, which the plaintiff argued led to insufficient staffing for the patients. *See id.* at *1-2. The plaintiff's employment was subsequently terminated. *See id.* at *1-3.

The plaintiff filed suit for, among other claims, wrongful termination in violation of public policy. *See id.* at *3. The plaintiff based his claim on an alleged public policy in favor of protecting physicians who report patient care concerns through the quality assurance chain at a hospital. *See id.* at *6. The plaintiff even cited several Ohio statutes in support of this argument,

and asserted more generally a claim of a basic public policy against terminating any physician who reports a patient care issue.  *See id*.

The Mitchell court, in an opinion by Judge Watson, affirmed the trial court's decision to grant summary judgment for the employer on this claim because the cited statutes did not support a public policy protecting physicians who share patient safety concerns outside the quality assurance chain, and because there was no general public policy of "patient safety."  *See id*. at *6-7.  As a result, the plaintiff could not establish the "clarity" or "jeopardy" elements.  *See id*.; *see also Cramer v. Fairfield Med. Ctr.*, 182 Ohio App. 3d 653, 914 N.E.2d 447, 455-57 (Ohio Ct. App. 2009) (affirming summary judgment against the plaintiff, a discharged radiologist, on a wrongful termination in violation of public policy because, among other issues, there was no general public policy regarding "physical safety of patients" under various Ohio statutes); *Galyean v. Greenwell*, No. 05CA11, 2007 WL 453273, at *1 (Ohio Ct. App. Jan. 29, 2007) (finding the same).  In this case, Plaintiff cites several statutes, all of which are intended to implicate a public policy of patient safety based upon Plaintiff's allegation of understaffing at the Mount Carmel West ICU.  However, consistent with the cases cited above, Plaintiff's allegation is not actionable under a theory of wrongful termination in violation of public policy. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for wrongful termination in violation of public policy because Plaintiff cannot establish the "clarity" element.

### 2. The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Advocating In Favor Of Patient Safety.

Even if patient safety was legally sufficient to maintain a claim for wrongful termination in violation of public policy, Plaintiff's claim still fails because the undisputed facts show that Defendants did not retaliate against Plaintiff for any alleged protected activity dealing with patient safety.  Rather, as argued in detail with respect to Plaintiff's discrimination and

27

whistleblower claims, Defendants terminated Plaintiff's employment because he impeded the investigation into the arterial line incident, improperly tried to remove a fellow Resident from clinical duties, and lied.   Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for wrongful termination in violation of public policy because Plaintiff cannot establish the "causation" element.  *See Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 773 N.E.2d 526, 529-30 (2002).

    **E.**       **<u>Defendants Are Entitled To Summary Judgment On Plaintiff 's Claim Alleging Retaliation In Violation Of The Federal False Claims Act.</u>**

In his second claim for relief, Plaintiff alleges that Defendants violated the anti-retaliation provisions of the federal False Claims Act ("FCA").  (*See* 2010 Case Second Amd. Complaint, at ¶¶ 128-32). Specifically, Plaintiff claims that he complained about working longer hours than permitted under ACGME guidelines, and that Defendants allegedly terminated him for making this report. (*See id.* at ¶¶ 58-69).   However, Defendants are entitled to summary judgment on this claim because Plaintiff admits that he only complained about ACGME violations, not any alleged fraud upon the government through Medicare reporting.  Additionally, even if this did constitute protected activity under the FCA (which it does not), the undisputed facts show that Defendants did not retaliate against Plaintiff.

The FCA provides a cause of action to an employee who "is discharged . . . or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section . . . ." 31 U.S.C. § 3730(h). In order to establish a *prima facie* case of retaliation in violation of the FCA, a plaintiff must prove that: (1) he engaged in protected activity; (2) the defendant knew of this exercise of his protected

rights; (3) the defendant took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse action. *See Scott v. Metropolitan Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007).

If the plaintiff can establish a *prima facie* case of retaliation in violation of Section 3730(h) of the FCA, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse actions. *Id*. If the defendant does articulate such a reason, the burden then shifts back to the plaintiff "to show by a preponderance of the evidence [the defendant's] stated lawful reason was a pretext for retaliation." *Id*. To do so, the plaintiff "must then produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation and infer that [the defendant] intentionally discriminated against [him] because of protected activity." *Id*.

### 1. Plaintiff Did Not Engage In Protected Activity.

The FCA requires that "protected activity" be done "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h); *see also McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 516 (6th Cir. 2000). The FCA's "in furtherance of" language requires a plaintiff to be "investigating matters that reasonably could lead to a viable False Claims Act case." *McKenzie*, 219 F.3d at 515. The Sixth Circuit has made it clear that "although internal reporting may constitute protected activity, the internal reports must allege fraud on the government." *See id*. at 516. In the absence of evidence of that activity, summary judgment in favor of the defendant is appropriate. *See id*.

In this case, there is no evidence that Plaintiff's activity was in furtherance of any action that could be filed under the FCA. To the contrary, Plaintiff admitted that when he complained that his work schedule would exceed the ACGME's maximum hours rule, his concern was only

29

that Residents were being overworked.  (Pl. Dep. 261-62).  Plaintiff expressly admitted that his internal report regarding Resident hours was not alleging that Mount Carmel was committing fraud on the government, and that at the time he was not aware of any laws that were being violated.   (Pl. Dep. 261-62, 311-12).   As a matter of law, this does not constitute protected activity.  *See McKenzie*, 219 F.3d at 516.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for retaliation in violation of the FCA because Plaintiff cannot establish that he engaged in protected activity.

> **2.     The Undisputed Facts Show That Defendants Did Not Retaliate Against Plaintiff For Complaining About Alleged Medicare Violations.**

Even if Plaintiff had engaged in protected activity by reporting alleged fraud on the government by Defendants, there is still no evidence of causation.  Specifically, the time period between Plaintiff's complaints about exceeding the maximum hours rule in the Family Medicine program in September of 2006 and Plaintiff's actual termination of employment from the Internal Medicine Program in July of 2009—nearly three years later and after Mount Carmel permitted Plaintiff to transfer programs and renewed his contract twice more—is so long as to undercut any inference of retaliation.   (*See* Pl. Dep. 292-94).   Plaintiff has produced no other evidence of any causal link between his complaints regarding maximum hours and his termination of employment.  His claim fails as a matter of law.  *See Scott v. Metropolitan Health Corp.*, 234 Fed. App'x 341, 346 (6th Cir. 2007).

### F.     Defendants Are Entitled to Summary Judgment on Plaintiff's Claim Alleging Abuse of Process.

In his eighth claim for relief in the 2010 case, Plaintiff alleges the common-law tort of abuse of process. (*See* 2010 Case Second Amd. Complaint, at ¶¶ 133-37).  Plaintiff alleges that Defendants, in investigating the A-line incident and later terminating Plaintiff for his

wrongdoing in connection with the investigation of the incident, abused and perverted their investigatory and disciplinary process with the ulterior motive of retaliating against Plaintiff for reporting alleged Medicare and ACGME violations. (*See id*.).  Plaintiff's claim fails because internal administrative investigations for employment purposes do not constitute a "legal proceeding," which is a required element for this tort. Additionally, Plaintiff has no evidence that Defendants perverted the process to accomplish an ulterior motive.

Ohio recognizes the tort of abuse of process.  *See Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St. 3d 294, 626 N.E.2d 115, 117-18 (1994).  In order to recover under this tort, a plaintiff must prove: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process.  *See id*. at 118.

### 1. Plaintiff Cannot Establish The First Element Because He Cannot Show That There Was A "Legal Proceeding."

Under the first element of this claim, a "legal proceeding" does not include internal investigations for employment purposes, but rather a lawsuit, subpoena, or other legal or judicial process.  *See Gillman v. Schlagetter*, No. 3:08-CV-454, 2010 WL 3447807, at * 11 (S.D. Ohio Aug. 30, 2010) ("[A]n administrative investigation for employment purposes within the sheriff's office is not a legal proceeding.").

Here, Plaintiff's claim is based solely on the A-line investigation, his termination and Mount Carmel's internal, administrative process to review that termination.  (2010 Case Second Amd. Complaint ¶¶ 133- 37).  He admits that Mount Carmel has never initiated a lawsuit, claim, or action against him, and has never reported him, or filed any charges against him, with any

state or federal agency, including those governing his profession.   (Pl. Dep. 250-51).

Accordingly, as a matter of law, Plaintiff has failed to establish the first element of his claim.

> **2.**     **Plaintiff Cannot Establish The Second Element Because There Is No Evidence That The Investigatory And Disciplinary Process Was Perverted By An Ulterior Motive.**

Under the second element, a claim will fail "where the defendant has done nothing more

than carry out the process to its authorized conclusion, even though with bad intentions."  *See*

*Yaklevich*, 626 N.E.2d at 118.  Here, even if, for the sake of argument, the A-line investigation

and Plaintiff's termination were "legal proceedings," there is no evidence that Mount Carmel

perverted the investigation or the termination to achieve a purpose for which they were not

designed: the investigation revealed wrongdoing and Mount Carmel took appropriate action.

Plaintiff's abuse of process claim fails as a matter of law.

> **G.**     **Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Intentional Infliction Of Emotional Distress.**

In his third claim for relief in the 2010 Case, Plaintiff alleges intentional infliction of

emotional distress. (*See* 2010 Case Second Amd. Complaint, at ¶¶ 111-114).   Specifically,

Plaintiff claims that Defendants intentionally caused Plaintiff emotional distress and public

humiliation by terminating his medical residency under an allegedly false pretext.  *See id*.  The

Court should dismiss this claim with prejudice for two reasons.  First, there is no evidence that

Defendants knew Plaintiff would suffer emotional distress and intended it to happen.  Second,

there is no evidence that Defendants' conduct was extreme and outrageous.

Ohio law recognizes the tort of intentional infliction of emotional distress.  *See Yeager v.*

*Local Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 6 Ohio St. 3d 369,

453 N.E.2d 666, 671 (1983), *abrogated on other grounds by Welling v. Weinfield*, 113 Ohio St.

3d 464, 866 N.E.2d 1051 (2007).  However, "the Ohio Supreme Court set a very high bar for

recovery." *Scarabino v. E. Liverpool City Hosp.*, 155 Ohio App. 3d 576, 802 N.E.2d 188, 191 (Ohio Ct. App. 2003). To establish this tort, a plaintiff must prove: (1) that the defendant either intended to cause emotional distress, or knew that its conduct would result in serious emotional distress to the plaintiff; (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) that the defendant's actions proximately caused psychological injury to the plaintiff; and (4) that the plaintiff suffered serious emotional distress of a nature no reasonable person could be expected to endure. *See, e.g.*, *Rhoades v. Chase Bank*, No. 10AP-469, 2010 WL 5550703, at *3 (Ohio Ct. App. Dec. 30, 2010).

With respect to the second element, the Ohio Supreme Court stated in Yeager that the term "extreme and outrageous" is rarely met: "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Yeager*, 453 N.E.2d at 671. "The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*

In the employment context, the Sixth Circuit has held that an adverse employment action, even if based upon discrimination, does not constitute "extreme and outrageous" conduct without proof of something more. *See, e.g.*, *Church v. Executive Jet Services, Inc.*, No. 2:03-CV-20, 2005 WL 1925711, at *12 (S.D. Ohio Aug. 11, 2005) (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999)); *see also Kohorst v. Van Wert Hosp.*, No. 3:09CV2031, 2010 WL 4883784, at *5 (N.D. Ohio Nov. 24, 2010) (citing *Godfredson*).

Here, Plaintiff alleges nothing more than an adverse employment action, which he claims is based on discrimination and false pretenses.  (2010 Case Second Amd. Complaint, at ¶¶ 111-114).  He alleges nothing extreme or outrageous that could form the basis for a valid claim, and has presented no evidence of any such conduct.  Accordingly, his claim fails as a matter of law.

### H.   Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Spoliation Of Evidence.

In his fifth claim for relief, Plaintiff alleges the common-law tort of spoliation of evidence.  (*See* 2010 Case Second Amd. Complaint, at ¶¶ 118-24).  Plaintiff alleges that Defendants, despite knowing that Plaintiff would likely file a lawsuit, allegedly destroyed the Residents' petition regarding ICU staffing at Mount Carmel West Hospital.  (*See id.*).  Plaintiff's claim fails because the petition was not destroyed.  In fact, the original petition still exists and a copy has been produced to Plaintiff during discovery.

Ohio law recognizes a tort for the interference with or destruction of evidence.  *See Smith v. Howard Johnson Co., Inc.*, 67 Ohio St. 3d 28, 615 N.E.2d 1037, 1038 (1993).  The elements for this cause of action are: (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts.  *See id.*  Clearly, if the evidence that was allegedly destroyed still in fact exists, then the claim has no merit and must be dismissed. *See id.*

As Plaintiff's testimony shows, this claim is based solely on hearsay evidence that does not even support the claim.  Plaintiff testified that his spoliation claim was based solely on a fellow Resident's statement to Plaintiff that Dr. Weiss told her someone told him to destroy the petition, but that he kept a copy.  (Pl. Dep. 252).  As an initial matter, the other Resident's

statement to Plaintiff is an out-of-court statement offered to prove the matter asserted in the statement, and is therefore hearsay under Fed. R. Evid. 801.  Plaintiff may not avoid summary judgment in reliance on hearsay evidence.  Fed. R. Civ. P. 56(c); *Knox v. Neaton Auto Products Mfg., Inc.*, 375 F.3d 451, 457 (6th Cir. 2004) ("A court cannot rely on unsworn inadmissible hearsay when ruling on a summary judgment motion.").

Moreover, it is undisputed that the original petition still exists and is in the possession of Defendants.  (Pl. Dep. 253; Weiss Dec. ¶ 24).  Dr. Weiss's declaration attesting to the existence of the petition, as well as a recent copy of the petition attached thereto as an exhibit, demonstrates that there is no genuine issue of material fact on this issue.  (*See* Weiss Decl. ¶ 24 & Ex. B).  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for spoliation of the evidence, as a matter of law.

## I.     Defendants Are Entitled To Summary Judgment On Plaintiff's Claim Alleging Breach of Contract.

In his first claim for relief in the 2012 Case, Plaintiff alleges that Mount Carmel breached his residency contract by failing to comply with Mount Carmel and ACGME policies regarding the conduct of the investigation into the A-line incident and Plaintiff's termination and appeal, failing to comply with work-hour and patient-admission limitations, and causing Plaintiff to file false program evaluations.  (2012 Case Amd. Complaint, ¶¶ 92-97).

"A complaining party establishes a claim for breach of contract by proving the following elements by a preponderance of the evidence: (1) a contract existed, (2) the complaining party fulfilled its contractual obligations, (3) the opposing party failed to fulfill its obligations, and (4) the complaining party incurred damages as a result of this failure."  *Marion Forum, L.L.C. v. Lynick Ents., Inc.*, No. 9-12-13, 2012 WL 6571388, at *2 (Ohio Ct. App. Dec. 17, 2012) (internal quotation omitted).  Plaintiff's claim fails because Mount Carmel did not fail to fulfill any

contractual obligations to Plaintiff and because Plaintiff did not fulfill all of his contractual obligations to Mount Carmel.

### 1. Mount Carmel Did Not Breach Any Contractual Promise To Plaintiff.

Plaintiff points to no provision of his actual residency contract that he claims was breached. (2012 Case, Amd. Complaint, ¶¶ 92-97; 2013 Pl. Dep. 48 & Ex. 3). Indeed, the residency contract itself provides under the heading "Responsibilities of Hospital" the obligations to pay Plaintiff his agreed-upon salary and to provide certain employee benefits, all of which Mount Carmel indisputably provided. (2013 Pl. Dep. 51).

Instead, Plaintiff argues that Mount Carmel was required to follow certain policies with regard to his investigation, termination, and appeal, work-hour and patient limitations, and program evaluations. With respect to Plaintiff's investigation, termination and appeal, even if following Mount Carmel and ACGME policies were part of Mount Carmel's contractual obligations, the undisputed evidence is that Mount Carmel followed those policies.

The ACGME only requires that all residency programs have a "due process" policy in place that will apply when a Resident is disciplined or terminated from a program. (Weiss Dec. ¶ 21). The ACGME does not specify what the content of the policy must be; it only requires that programs have a policy and follow it. (Weiss Dec. ¶ 22). Mount Carmel's due process policy provides that a Resident who is terminated may seek review of the termination by a special Program Education Committee ("PEC"). (Pl. Dep. 129-30, 237 & Ex. 6, p. 10).

The policy states that the PEC, which consists of the Assistant Program Director and at least two faculty members, shall meet with the Resident and the Program Director, who may present their respective arguments and evidence regarding the termination decision. (Pl. Dep. Ex. 6, p. 10). The PEC then deliberates and presents its recommendation to the Program Director, who is obliged to consider the recommendation, but need not follow it, in deciding

whether to uphold the termination.  *Id*.  The Resident then has the option of asking the Director of Medical Education and an Administrative Review Committee ("ARC") to review whether the PEC followed the grievance procedure and honored due process.  *Id*.

Plaintiff sought review of his termination by the PEC.  (Pl. Dep. 129-30).  Dr. Weiss and Dr. Nayyar both spoke to the PEC.  (Plaintiff Dep. 131, 233-34).  Plaintiff testified that he had the opportunity to speak and address everything in his termination letter.  (Pl. Dep. 131, 233-34). Plaintiff has testified that he "assumed" he would be entitled to a lawyer and to have access to his to his personnel file prior to the PEC hearing; however, when pressed at his deposition, Plaintiff could not identify any language in the applicable policy that actually provides for an attorney or access to documents.  (Pl. Dep. 238-243).  As such, Plaintiff has not identified any actual policy that was not complied with.

The same is true with Plaintiff's allegations regarding work hours, patient admission rates, and program evaluations.  Plaintiff has not identified any specific policies regarding these issues, let alone any binding contractual requirements.  Moreover, Plaintiff's allegations regarding those issues show that no relief may be granted with respect to them, because there is no allegation or evidence that Plaintiff was required to work excessive hours, served too many patients, or was "forced" to submit a false evaluation (none of which actually happened) during the pendency of his 2009 Residency Agreement.  That agreement is the only one at issue in this lawsuit.  (2012 Case, Amd. Complaint ¶¶ 18, 93).  Plaintiff has not alleged a breach of any prior agreements.[4]   As such, his breach of contract claim fails as to those issues.

---

[4] Even if he had, Plaintiff was fully compensated under those agreements, and therefore would have no damages in the event of their breach.

## 2. Plaintiff Did Not Fulfill All Of His Contractual Obligations To Mount Carmel.

One of the requirements for surviving summary judgment on Plaintiff's breach of contract claim is that Plaintiff must establish that he complied with all of his contractual obligations to Mount Carmel. This he cannot do. Section 3.1 of his residency agreement requires Plaintiff to act in accordance with the ethical principles of his profession. Section 3.4 requires that he present himself "in a professional manner, including appearance and behavior." (2013 Pl. Dep. Ex. 3). However, Plaintiff has admitted that he lied during the investigation into the A-line incident, and that not being truthful is a violation of the professionalism requirement. (Pl. Dep. 116-17; 129, 265). On this undisputed evidence, Plaintiff may not pursue his breach of contract claim, as he failed fulfill all of his own contractual obligations. *See Marion Forum*, 2012 WL 6571388, at *2. As Plaintiff can show neither breach of any contractual obligation by Mount Carmel nor adherence to his own obligations, Mount Carmel is entitled to summary judgment on Plaintiff's breach of contract claim.

## J. Defendants Are Entitled To Summary Judgment On Plaintiff's Claims Of Promissory Estoppel And Fraudulent Misrepresentation.

In his second and third claims for relief in the 2012 Case, Plaintiff alleges that Mount Carmel is subject to promissory estoppel and engaged in fraudulent misrepresentation by representing that Mount Carmel and ACGME policies would be followed and that his personnel file would remain confidential, and by allegedly breaching those promises. (2012 Case Amd. Complaint ¶¶ 98-106).

The elements necessary to establish a claim for promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance. *Sims v. Village of Midvale*, No. 2012 AP 03 0021, 2012 WL 6681851, at

*4 (Ohio Ct. App. Dec, 18, 2012).  Fraudulent misrepresentation has many overlapping elements.  "In order to prove a claim of fraudulent misrepresentation in a contract action, five basic elements must be satisfied: '(1) a false representation concerning a fact material to the transaction; (2) knowledge of the falsity of the statement or utter disregard for its truth; (3) intent to induce reliance on the misrepresentation; (4) reliance under circumstances manifesting a right to rely; and (5) injury resulting from the reliance.'"  *Dana Partners, L.L.C. v. Koivisto Constructors & Erectors, Inc.*, No. 2011-T-0029, 2012 WL 6783637, at *11 (Ohio Ct. App. Dec, 31, 2012) (internal quotation omitted).  "In regard to the second element of the claim, it has been held that a finding of fraud cannot be predicated upon an innocent mistake of fact; rather, it must be shown that the defendant had actual knowledge or was grossly negligent in failing to ascertain the truth."  *Id.*  Plaintiff's claims fail because there was no promise or representation that was not complied with; and because there was no detrimental reliance.

### 1. There Was No Promise Or Misrepresentation That Was Not Complied With.

Plaintiff's complaint alleges that Mount Carmel made promises and representations about following ACGME policies and about keeping his personnel file confidential.  (2012 Case Amd. Complaint ¶¶ 99, 103).  Plaintiff admitted at his deposition that he was not seeking to enforce any promises other than the ones addressed above with respect to his breach of contract claim. (2013 Pl. Dep. 57).  In any event, where "the plaintiff ha[s] signed a written agreement governing his employment, the plaintiff [cannot] 'invoke the doctrine of promissory estoppel on the basis of alleged promises that contradict that written contract.'"  *Worthington v. Speedway SuperAmerica LLC*, No. 04CA2938, 2004 WL 2260501, at *4 (Ohio Ct. App. Sept. 20, 2004). As such, Plaintiff's claims with respect to Mount Carmel's adherence to its policies regarding his investigation, termination, and appeal fail for the same reasons articulated above.

39

Plaintiff's claims with respect to any requirement to keep the contents of his personnel file confidential also fail.  Plaintiff alleges that by making a statement to the Ohio News Network in response to statements that Plaintiff had already made to ONN regarding his termination and his opinions regarding the quality of care at Mount Carmel West, Mount Carmel divulged confidential information from Plaintiff's personnel file.  However, a close comparison of Mount Carmel's statement and Plaintiff's complaint in this case shows that this is not the case.  Mount Carmel did not disclose anything that Plaintiff had not already disclosed in his public court filing.

Specifically, Mount Carmel's statement was that "Dr. Nayyar was dismissed from his residency program following a thorough investigation into a patient care safety issue for which he was responsible."  (2013 Pl. Dep. Ex. 1).  As Plaintiff admitted in his deposition, the Second Amended Complaint in his 2010 lawsuit (filed before Mount Carmel made its statement to the media) stated that Plaintiff was dismissed from his residency program.  (2013 Pl. Dep. 40-41; 2010 Case Second Amd. Complaint ¶38).  The complaint also stated that Plaintiff was dismissed after Mount Carmel conducted an investigation into the A-line incident.  (2013 Pl. Dep. 42-43; 2010 Case Second Amd. Complaint ¶¶ 32, 37).  Plaintiff admitted that the A-line incident involved a medical procedure and that patient safety is always implicated in a medical procedure. (2013 Pl. Dep. 43-45).  Plaintiff admitted that the A-line medical procedure was mentioned in paragraphs 31, 32, and 34 of his complaint.  (2013 Pl. Dep. 46).  Finally, Plaintiff admitted that the A-line procedure referenced in his complaint was his responsibility to complete.  (2013 Pl. Dep. 46-47).  It is therefore undisputed that every fact in Mount Carmel's statement to ONN was stated first by Plaintiff in his public complaint to this Court.  Mount Carmel did not disclose any confidential information from Plaintiff's personnel file.  As such, even if Mount Carmel was

40

required to keep Plaintiff's file confidential, it did so, and his promissory estoppel and fraud claims fail for that reason.

### 2. Plaintiff Admits He Did Not Detrimentally Rely On Any Statements Or Representations.

"Reasonable or justifiable reliance is an element of promissory estoppel, fraudulent misrepresentation, and negligent misrepresentation." *Heinz & Assoc., Inc. v. Diamond Cellar Holdings, L.L.C.*, No. 11AP-688, 2012 WL 1079087, at *4 (Ohio Ct. App. Mar. 30, 2012). However, Plaintiff admitted at his deposition that he did not do anything differently in reliance on any statements by Mount Carmel than he would have in the absence of those statements. (Pl. Dep. 58). Plaintiff did not forego any other employment opportunities in accepting his third year of residency with Mount Carmel. (Pl. Dep. 59-61). As such, his promissory estoppel and fraudulent misrepresentation claims fail as a matter of law for that additional reason. *Heinz & Assoc.*, 2012 WL 1079087, at *4.

### K. Defendants Are Entitled To Summary Judgment On Plaintiff's O.R.C. 4112 Claim.

Plaintiff's final claim alleges that Mount Carmel terminated Caucasian resident Jonathan Borders in order to defeat Plaintiff's Title VII claim, and that this act of sabotage is an independent violation of Ohio Revised Code Section 4112.02. (2012 Case Amd. Complaint ¶¶107-110). Section 4112.02 provides in pertinent part that:

> [i]t shall be an unlawful discriminatory practice . . . [f]or any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A). Plaintiff's claim fails because the actions he alleges do not constitute a violation of Section 4112.02; because, even if it could, there is no evidence that Dr.

Borders' termination was for any improper reason or was connected to Plaintiff in any way; and because, as explained above, Plaintiff's Title VII claim is not a "valid claim."

**1.    The Alleged Actions Are Not An Independent Violation Of Section 4112.02.**

Section 4112.02 makes it unlawful because of *a person's* race or other protected class to discharge, refuse to hire, or otherwise discriminate against "*that person*."  The action Plaintiff asserts was taken on account of Plaintiff's race in this claim was the termination of *Dr. Borders*, not of *Plaintiff*.  As Plaintiff is asserting that *Dr. Borders* was discharged not in order to discriminate against Dr. Borders, but against Plaintiff, he has not stated a claim that a person's (i.e., Plaintiff's) race resulted in an adverse employment action against *that person*, and therefore has not articulated an independent violation of Section 4112.02 upon which relief may be granted.

**2.    There Is No Evidence That Dr. Borders' Termination Was Improper Or Related To Plaintiff.**

Even if Plaintiff's claim was congnizable, it would fail because there is no evidence that Dr. Borders did not deserve to be terminated or that his termination connected to Plaintiff in any way.  Dr. Borders was terminated for lying about an issue related to patient care, just as Plaintiff was.  (2011 Weiss Dep. 230-33 (cited pages attached as Exhibit B to this memorandum)).  Both Plaintiff and Dr. Borders had prior, more minor infractions, for which they were not terminated. Plaintiff threatened to fight a faculty member (Dr. Tamaskar), yelled at nurses, and missed morning report.  (2013 Weiss Dep. 37-38 (cited pages attached as Exhibit C to this memorandum).  Dr. Borders missed morning report and had absences and tardies, for which he provided dubious excuses.  (*See id.*).  Neither was terminated for those lesser infractions.  *See id*. Both, however, were terminated when they engaged in unprofessionalism relating to the care of Mount Carmel's patients.  There is no evidence that Dr. Borders was treated more favorably than

Plaintiff, or that Dr. Borders was terminated for reasons that did not merit termination. Indeed, he was terminated for the same sort of unprofessional conduct for which Mount Carmel terminated Plaintiff. No evidence exists that Dr. Borders did not engage in that conduct. As such, Plaintiff's claim lacks any evidentiary support, and fails as a matter of law.

### 3. Plaintiff's Title VII Claim Is Not A Valid Claim.

Finally, Plaintiff's claim that Mount Carmel terminated Dr. Borders in order to sabotage his valid Title VII claim fails for the simple reason, as explained in more detail above, that Plaintiff's Title VII claim is not a valid claim on which Plaintiff can survive summary judgment. This claim must fall with it.

### IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their Motion for Summary Judgment, dismissing all of Plaintiff's claims with prejudice.

Respectfully submitted,

/s/ M.J. Asensio
M. J. Asensio (0030777), Trial Attorney
Kristopher J. Armstrong (0077799), Of Counsel
BAKER & HOSTETLER, LLP
65 East State Street, Suite 2100
Columbus, Ohio 43215
Telephone: (614) 228-1541
Facsimile: (614) 462-2616
masensio@bakerlaw.com
karmstrong@bakerlaw.com

Attorneys for Defendants Mount Carmel Health
System, Dr. Weiss, Dr. Tang, and Dr. Streck

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2013, I electronically filed the foregoing document with the Clerk of Courts using the Court's CM/ECF system, which will send electronic notification of such filing to the following:

William W. Patmon, III, Esq.
M. Nikol Madison, Esq.
PATMON LLC
88 East Broad Street, Suite 2070
Columbus, Ohio 43215
wpatmon@patmonlaw.com

Attorneys for Plaintiff Sunil Nayyar

/s/ Kristopher J. Armstrong
 Attorney for Defendants